648 F.2d 1278
 9 O.S.H. Cas.(BNA) 1709, 1981 O.S.H.D. (CCH) P 25,379
KENT NOWLIN CONSTRUCTION COMPANY, INC., Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, and
Secretary of Labor, Respondents.
 No. 79-1112.
 United States Court of Appeals,
Tenth Circuit.
 May 11, 1981.
 
 Wayne E. Bingham of Pickering & Bingham, Albuquerque, N. M., for petitioner.
 Laura V. Fargas, Atty., Washington, D. C., (Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Allen H. Feldman, Acting Counsel for Appellate Litigation, U. S. Dept. of Labor, Washington, D. C., and James E. White, Regional Sol., Dallas, Tex., with her on the brief), for respondents.
 Before SETH, Chief Judge, LOGAN, Circuit Judge, and TEMPLAR, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 Kent Nowlin Construction Co. appeals the decision and order of the Occupational Safety and Health Review Commission (Commission) finding it guilty of willful, repeated, and serious violations of safety standards promulgated under authority of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq.
 
 
 2
 The issues raised on appeal are whether substantial evidence supports the Commission's findings that Kent Nowlin committed (1) a willful violation of 29 C.F.R. § 1926.550(a)(15)(i)[1] by allowing its Bantam crane to be operated within ten feet of a power line (which caused the death of a Kent Nowlin employee), (2) a repeated violation of 29 C.F.R. § 1926.550(a)(2)[2] when, after two prior citations relating to other cranes, it failed to conspicuously post a rated load capacity chart on the Bantam crane, and (3) a serious violation of 29 C.F.R. § 1926.550(a)(5)[3] by permitting continued use of its Bantam crane despite two twisted sections at the crane boom's base and makeshift repairs of the boom's cord.
 
 
 3
 Our review is limited by 29 U.S.C. § 660(a), which provides that "the findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consolidated Edison Co. v. NLRB., 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), "and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951).
 
 
 4
 Our reading of the record persuades us that there is substantial evidence, considered, as it must be, from a standpoint of the declared objects and purposes of the Act, see 29 U.S.C. § 651, to sustain the findings of the Commission. See Stockwell Mfg. Co. v. Usery, 536 F.2d 1306, 1309 (10th Cir. 1976).
 
 Willful Violation
 
 5
 There is overwhelming evidence in the record to support the Commission's finding that Kent Nowlin's truck-mounted Bantam crane was operated within ten feet of and actually came in contact with a 7,200 volt power line, causing the death of one of Kent Nowlin's employees. The record also supports the Commission's finding that the accident was not an isolated incident resulting from an employee's non-compliance with Kent Nowlin's instructions and uniformly enforced work rules.
 
 
 6
 Kent Nowlin initially used a small Hydro crane with a retractable telescoping boom to pull sand points from the ground where a sewer line was being laid. The Hydro crane apparently was needed on another job and was replaced by the Bantam crane, which had a nonretractable 31 1/2 foot boom mounted on a platform 4 feet 8 inches above the ground. (The power line was 28 feet 3 1/2 inches above the ground at the point of apparent contact with the crane.) The record shows that three supervisory employees crew leader Romero, project superintendent Stratton, and safety director Collins as well as crane operator Beattie were aware of the problems and hazards involved in using the crane in this location. Collins had toured the project area and had discussed possible protective measures with the electrical engineering supervisor of the utility that owned the power lines.[4] When crew leader Romero called project superintendent Stratton's attention to the hazard of using the Bantam crane he was told "to go ahead and use it because he would only be a little while." Record, Vol. II at 37. Considering the extent of knowledge on the part of Kent Nowlin's supervisory personnel and their deliberate decisions to proceed in spite of the hazards, without taking special precautions[5], we must reject the isolated incident and violation of work rules defense argued by Kent Nowlin.
 
 
 7
 Although this is a close case, we agree with the Commission that the violation can be considered willful within the meaning of the Act and our prior rulings. This Court, in a case involving Kent Nowlin, has approved the following definition of willfulness in the context of the Act:
 
 
 8
 " 'The failure to comply with a safety standard under the Occupational Safety and Health Act is willful if done knowingly and purposely by an employer who, having a free will or choice, either intentionally disregards the standard or is plainly indifferent to its requirement. An omission or failure to act is willfully done if done voluntarily and intentionally.' "
 
 
 9
 Kent Nowlin Constr. Co. v. OSHRC, 593 F.2d 368, 372 (10th Cir. 1979), quoting United States v. Dye Constr. Co., 510 F.2d 78, 81 (10th Cir. 1975). While this employer may not have intentionally flouted the standard, its apparent willingness to subject its employees to such danger suggests it was plainly indifferent to the standard's requirement. In such a case we are reluctant to say the Commission is restricted to charging merely a "serious" offense, which carries a maximum penalty of $1,000. The fact that only $3,000 was assessed, against a possible $10,000 maximum, indicates the Commission properly considered relative degrees of dereliction within the willful violation category. We hold the Commission's finding that Kent Nowlin willfully violated 29 C.F.R. § 1926.550(a)(15)(i) is supported by the record.
 
 Repeated Violation
 
 10
 The Commission's finding that Kent Nowlin failed to do all that it could reasonably be expected to do under the circumstances to make sure a rated load capacity chart was present on the Bantam crane is also supported by the record. Kent Nowlin's argument that no rated load capacity chart was needed on the particular crane involved in this case is without merit. The cited standard, 29 C.F.R. § 1926.550(a)(2), makes no exception for cranes allegedly used exclusively for light lifting.
 
 
 11
 Prior to the current citation, Kent Nowlin had been cited twice for failing to have a rated load capacity chart present on one or more of its cranes. The record shows that the chart on this particular crane had been missing frequently in the past and had been missing for two weeks prior to the accident prompting this citation. There is no evidence that the company intentionally refused to post the load capacity chart. Nevertheless, 29 U.S.C. § 666(a) provides that "(a)ny employer who willfully or repeatedly violates regulations prescribed pursuant to this (Act), may be assessed a civil penalty of not more than $10,000 for each violation." (Emphasis added).
 
 
 12
 Other circuits are split on the meaning of "repeated" violations. The Third Circuit stated in Bethlehem Steel Corp. v. OSHRC, 540 F.2d 157 (3d Cir. 1976), that repeated violation citations are designed to cover only intentional "flauntings" of the Act. The Fourth Circuit rejected this view, however, declaring that "the mere fact that an enhanced penalty is provided for in § 666(a) does not suggest that Congress intended willful and repeated violation citations to be appropriate only when an intentional flouting of the Act occurred." George Hyman Construction Corp. v. OSHRC, 582 F.2d 834, 840 (4th Cir. 1978). The Ninth Circuit has also declined to adopt the Third Circuit position because it "essentially equates 'willful' with 'repeated' while failing to give appropriate weight to the disjunctive 'or.' " Todd Shipyards Corp. v. Secretary of Labor, 566 F.2d 1327, 1331 (9th Cir. 1977). We agree with this reasoning and adopt the position of the Fourth and Ninth Circuits.
 
 
 13
 The legislative history of the Act supports our position. The section of the committee report that analyzed the penalty provisions stated that for "(o)ther than willful violations, the violator's intent should not be a pertinent factor in the original assessment of penalties." H.R.Rep.No.91-1291, 91st Cong. 2d Sess. 26 (1970). The obvious purpose of § 666(a) is to encourage employers who have previously violated a standard to take the necessary precautions to prevent the recurrence of similar violations. Thus, we think Congress intended to permit enhanced penalties when employers permit violations of the same standard to occur several times, even though the employer's intent or negligence falls short of the "willful" level. See Todd Shipyards Corp. v. Secretary of Labor, 586 F.2d 683 (9th Cir. 1978). See also Desarrollos Metropolitanos, Inc. v. OSHRC, 551 F.2d 874 (1st Cir. 1977). Accordingly, we uphold the Commission's imposition of an enhanced penalty for Kent Nowlin's repeated failure to post rated load capacity charts.
 
 Serious Violation
 
 14
 We conclude there is substantial evidence in the record to support a finding that Kent Nowlin violated 29 C.F.R. § 1926.550(a)(5) by failing to maintain its Bantam crane in safe operating condition. Kent Nowlin's work crew operated the crane despite the fact that sections of the boom were bent and twisted, with pieces of angle iron welded over the cords. OSHRC testimony showed that these deficiencies reduced the load capacity of the crane, posing hazards of boom collapse or tipping of the crane. We recognize the crane was probably not lifting loads exceeding its diminished capacity at the time of citation. Nevertheless, in determining whether a violation is "serious" within the meaning of 29 U.S.C § 666(j) we do not focus on the probability of an accident occurring, rather we consider the probability of death or serious bodily harm should an accident occur. See Dorey Elec. Co. v. OSHRC, 553 F.2d 357 (4th Cir. 1977). We agree with the Ninth Circuit that "(w)here a violation of a regulation renders an accident resulting in death or serious injury possible, however, even if not probable, Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation." California Stevedore & Ballast Co. v. OSHRC, 517 F.2d 986 (9th Cir. 1975). We conclude the Commission was justified in holding the violation was serious within the meaning of 29 U.S.C. § 666(j).
 
 
 15
 AFFIRMED.
 
 
 
 *
 Honorable George Templar of the United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 29 C.F.R. § 1926.550(a)(15)(i) declares:
 "(15) Except where electrical distribution and transmission lines have been deenergized and visibly grounded at point of work or where insulating barriers, not a part of or an attachment to the equipment or machinery, have been erected to prevent physical contact with the lines, equipment or machines shall be operated proximate to power lines only in accordance with the following:
 (i) For lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet; "
 
 
 [2]
 29 C.F.R. § 1926.550(a)(2) reads:
 "(2) Rated load capacities, and recommended operating speeds, special hazard warnings, or instruction, shall be conspicuously posted on all equipment. Instructions or warnings shall be visible to the operator while he is at his control station."
 
 
 [3]
 29 C.F.R. § 1926.550(a)(5) provides:
 "(5) The employer shall designate a competent person who shall inspect all machinery and equipment prior to each use, and during use, to make sure it is in safe operating condition. Any deficiencies shall be repaired, or defective parts replaced, before continued use."
 
 
 [4]
 Collins claims to have discussed only backhoes, but his testimony shows knowledge of the hazard which we believe applies also to cranes
 "Q. When you were down talking with Bob James, did you ever talk about cranes relative to power lines?
 A. No.
 Q. What did you talk about?
 A. I talked about backhoes, because cranes are mobile. Our cranes are mobile cranes. They can be maneuvered very easily. Relative to a backhoe. A crane has the option of where it sets in on a job like that. There is no mandatory position for a crane on that job. Backhoe, that's not true, because we don't dictate where that sewer pipe goes. We have to dig where the designing engineer says to dig. And they do it all the time, tell us to put it right through the middle of an overhead or underground utility, that's where it has to go.
 Q. So, when you were concerned about power lines and the 10-foot rule, what were you concerned about?
 A. Backhoe.
 Q. Were you concerned about cranes?
 A. Sure, I was concerned about cranes, but the idea of cranes is again the same thing. A crane has got a boom that can go up and down. A backhoe has got to dig at the amount of depth.
 Q. O.K., you said that you didn't insulate cranes, or you didn't think of insulating your cranes. Is there a reason for that?
 A. Same thing I just went through. The crane had the ability to stay away from them, and I thought that we had done a good job on getting those cranes decaled and our training enough that our operators and the foremen know without any doubt what's required."
 Record, Vol. II at 346-47.
 
 
 [5]
 The company showed it conducted safety meetings at which it called attention to the requirement that cranes not be operated within 10 feet of a power line. Crane operator Beattie testified he had been operating the crane for two weeks before the accident. Record, Vol. II at 91. Kent Nowlin contends he had been employed only three days before the accident. See Appellant's Reply Brief, App. 2. In any event, Beattie testified that he attended no safety meetings before the accident and received instructions only to stay away from the power lines
 "Q. Had you ever attended a safety meeting or lecture since you joined Kent Nowlin's employ?
 A. No, sir.
 Q. What instructions had you received with regard to how close a crane could be operated to a power line?
 A. Well, the only instruction I received was the day I was hired, and that was to stay away from the lines and watch out for trucks."
 Record, Vol. II at 97.
 As to the sign on the crane concerning operation near power lines, Beattie's testimony was as follows:
 "Q. Are you aware that on the side of that crane there is a large, yellow sign that says, 'Unlawful to operate within ten feet of power lines'?
 A. I never saw the sign.
 Q. I show you what has been marked Exhibits 14 and 21 these are Complainant's exhibits is this the bantam crane?
 A. Yes.
 Q. This sign (indicating) on the crane, do you remember that?
 A. No.
 Q. You don't remember that?
 A. No.
 Q. This Exhibit No. 21 depicts the side of the cab that you would have been in, right?
 A. Yes.
 Q. So you would have had to climb through that doorway portrayed there to operate the crane, correct?
 A. Yes.
 Q. You didn't notice that sign?
 A. I never saw the sign there.
 Q. Could it have been that you just didn't recognize it or you didn't pay attention to it?
 A. I don't think so.
 Q. Does that mean you didn't recognize it or didn't pay attention to it?
 A. That means I never saw it.
 Record, Vol. II at 99-100.